## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**LENA M. HARRISON,**

**Plaintiff,**

**v.**                                          **Case No. 25-CV-389**

**FRANK J. BISIGNANO,**
*Commissioner of the*
*Social Security Administration,*

**Defendant.**

## DECISION AND ORDER

### 1. Introduction

Alleging that she has been disabled since July 15, 2020 (Tr. 15), plaintiff Lena M. Harrison seeks supplemental security income and disability insurance benefits. Harrison has acquired sufficient quarters of coverage to remain insured through December 31, 2027. (Tr. 15.) After Harrison's application was denied initially (Tr. 65-80) and upon reconsideration (Tr. 81-100), a hearing was held before Administrative Law Judge (ALJ) Gary A. Freyberg on March 27, 2023 (Tr. 2158-2227). Supplemental hearings were held on August 3, 2023 (Tr. 2138-2157), and June 25, 2024 (Tr. 40-64). The vocational expert (VE) Edward Pagella testified at all three hearings. *See* Tr. 45-47. On July 14, 2024, the ALJ issued a written decision concluding that Harrison was not disabled. (Tr. 12-39.) After the Appeals Council denied Harrison's request for

review on January 15, 2025 (Tr. 1-6), Harrison filed this action. The matter is now ready for resolution.

**2. ALJ's Decision**

In determining whether a person is disabled, an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). The ALJ found that Harrison "has not engaged in substantial gainful activity since July 15, 2020 the alleged onset date[.]" (Tr. 17.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). The ALJ concluded that Harrison has the following severe impairments: concussion and sequelae. (Tr. 18.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. §§ 404.1509, 416.909,

2

the claimant is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment or impairments are not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ found that Harrison "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (Tr. 21.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a). In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Harrison has the RFC

> "to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can never climb ladders, ropes, or scaffolds; must avoid excessive noise, defined as noise above the SCO coding of 3 (e.g. a department store or grocery store); must avoid all use of dangerous moving machinery and exposure to unprotected heights; is limited to occupations that do not require the use of a computer screen for more than 30 minutes at a time; and must avoid concentrated exposure to environments having light intensity greater than what is found in a typical office setting."

(Tr. 21.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant

3

work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560, 416.920(a)(4)(iv), 416.960. The ALJ concluded that Harrison is unable to perform any past relevant work. (Tr. 28.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c). At this step the ALJ concluded that Harrison was capable of working as a laundry folder (DOT 589.687-014), shirt presser (DOT 363.685-026), and packer (DOT 559.687-074). (Tr. 29.) Therefore, she was not disabled. (Tr. 29.)

## 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ

concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

### 4. Analysis

At step five, the agency bears the burden of demonstrating that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations. *See* 20 C.F.R. § 416.960(c)(2); *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022). ALJs often assess the testimony of a VE to determine whether significant numbers of jobs exist. *Id*. "VEs testify as to the kinds of work that a claimant can perform, as well as the prevalence of those jobs in the national economy based on statistics from publicly available sources, information obtained directly from employers, and data otherwise developed from their own experience in job placement or career counseling." *Fetting v. Kijakazi*, 62 F.4th 332, 337 (7th Cir. 2023) (citation and quotations omitted). The substantial evidence standard requires that the ALJ ensures the VE's job estimates are a product of a reliable method. *See Chavez v. Berryhill*, 895 F.3d 962, 968-69 (7th Cir. 2018) ("any method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability"); *see also Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) ("A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.").

The Social Security Administration authorizes the use of the Dictionary of Occupational Titles (DOT) to classify and identify jobs claimants can perform. *See* 20 C.F.R. § 416.966(d)(1). The publication, produced by the Department of Labor, lists job titles and their requirements. *Chavez*, 895 F.3d at 965. Notably, though, and rather unhelpfully, the DOT does not estimate how many positions exist in the national economy for each job title. *Id.* And because the DOT was last revised in 1991, many of its job descriptions are outdated. *See Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014) ("No doubt many of the jobs [in the DOT] have changed and some have disappeared.").

Accordingly, many VEs will cross-reference the Occupational Employment Statistics (OES) produced by the U.S. Bureau of Labor Statistics. *Fetting*, 62 F.4th at 337. The OES provides job-number estimates, but it classifies job titles under its own "standard occupational classification" (SOC) system—entirely different from the grouping used by DOT. *See Case v. Kijakazi,* No. 22-2379, 2023 U.S. App. LEXIS 19693, at *8 (7th Cir. Aug. 1, 2023) ("there is a mismatch between the DOT codes and [OES] data because they use different classification schemes"). SOC codes sort jobs into broad occupational categories, such as "lawyers" (SOC 23-1011) or "photographers" (SOC 27-4021). *See* Occupational Employment and Wage Statistics (OEWS) Profiles, U.S. Bureau Of Labor Statistics, https://data.bls.gov/oesprofile/ (last visited March 16, 2026). Those broad occupational categories encompass multiple DOT job titles under a single SOC code. So, while VEs can reference the number of jobs available within a larger SOC

6

Case 2:25-cv-00389-BBC     Filed 03/19/26     Page 6 of 19     Document 27

grouping, they must approximate how many of those jobs are the specific DOT positions the claimant can actually perform. *See Chavez*, 895 F.3d at 965-66 ("The use of one system to supply the job titles and another to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist."). VEs commonly use commercially available software products to access such data.

### A. Testimony

The ALJ presided over three separate hearings before determining that jobs exist in significant numbers for Harrison to perform. (Tr. 30-32.) At the first hearing, held March 2023, the VE testified that someone with Harrison's limitations could perform as a laundry worker, dishwasher, and cafeteria attendant. (Tr. 2200-01.) The VE further identified work as a laundry folder, with 65,000 positions nationally, shirt presser, with 195,000 positions nationally, and packer, with 90,000 positions nationally. The ALJ proposed a hypothetical where the person was limited to sedentary work, and the VE testified that jobs available would include inspector, with 45,000 positions nationally, assembler, with 85,000 positions nationally, and packer again, revised down to 70,000 positions nationally. (Tr. 2202-03.)

The VE testified that his estimates were based on 32 plus years of professional experience and job placements. (Tr. 2203-04.) When questioned by Harrison's counsel about which software product he used, the VE was evasive and combative, requiring the ALJ to take over questioning. (Tr. 2208-12.) Although the VE ultimately admitted to

referencing SkillTRAN and OccuBrowse (Tr. 2210), he refused to offer any explanation for how the programs work. *See* Tr. 2211 ("I'm not here to discuss SkillTRAN or OccuBrowse.").

Under further questioning from Harrison's counsel, the VE admitted that the DOT title supplied for "inspector" (DOT 669.687-014) was actually specific to "dowel inspector." (Tr. 2222.) A dowel inspector "[i]nspects dowel pins for flaws, such as square ends, knots, or splits, and discards defective dowels." (DOT 669.687-014.) However, the VE's estimate of 45,000 dowel inspector positions included "a bunch of other SOC codes or DOT titles." (Tr. 2222.) The VE "didn't document" how many DOT codes were lumped together in his estimate and did not know which SOC code encompassed the relevant DOT titles. (Tr. 2223.) At this point the ALJ cut off testimony and scheduled a supplemental hearing "to obtain additional evidence from the [VE]." (Tr. 30; *see also* Tr. 45 ("We adjourned that and scheduled a supplemental hearing, which was necessary by the fact that [counsel] had not completed his cross of [the VE] at that time and there were some post-hearing challenges to the [VE's] testimony at the March 7 hearing.")).

At the supplemental hearing, however, the VE testified that he had destroyed his notes and "was therefore unable to answer additional questions regarding his methodology at that time." (Tr. 30.) A third hearing was scheduled, and the VE was instructed to review his methodology by listening to the audio from the March 2023 hearing. (Tr. 30.) The ALJ reminded the VE that "the key is explaining how you got those

numbers." (Tr. 2154.) The ALJ further noted an issue in the VE's earlier testimony estimating 45,000 dowel inspector jobs: "Job Browser Pro says that there are only 221 individuals nationally performing the job of dowel inspector. So that's a pretty big difference, 45,000 versus 221." (Tr. 2152.)

Prior to the third hearing, the VE submitted a written response explaining his methodology—again emphasizing his "education, training, and 34 years of professional experience"—and amending his job-number estimates. (Tr. 715-16.) This time, the VE claimed there were 201 positions as a dowel inspector (amended down from his 45,000 estimate) and 1,333 positions as a packer (amended down from his 70,000 estimate). (Tr. 715-16.) Harrison's counsel submitted a written response objecting to the VE's amended analysis. (Tr. 30.)

A third hearing was held in June 2024. (Tr. 40.) The ALJ indicated that the methodology that the VE "had previously described was based in large part upon group numbers from SOC codes" and that "courts have been very concerned about translating the numbers from SOC code groups that contain multiple occupations into the estimates of job numbers for a particular code, which is necessary for the step five analysis." (Tr. 46.) The ALJ further advised the parties that he would not be considering any of the sedentary jobs the VE proposed, because "there's no support for it." (Tr. 58.)

This time, the VE testified that he used OccuBrowse Pro and "SkillTRAN, Job Browser Pro." (Tr. 48-49.) He stated that he started using Job Browser Pro as "it's typically

utilized in our industry" (Tr. 53) and it "gives numbers specific to the DOT." (Tr. 49). He once again revised his job-number estimates. (Tr. 52-53.) Following the hearing, Harrison's counsel again submitted a brief arguing that the VE was unable to explain his methodology. (Tr. 29; Tr. 764-65.)

The ALJ overruled Harrison's objections and issued a decision finding that despite her limitations, Harrison was not disabled. (Tr. 12-32.) Relying on the VE's testimony, the ALJ determined that Harrison could perform work such as laundry folder, shirt presser, and packer. (Tr. 29.) In his decision, the ALJ pointed to the VE's education and professional experience, and that he testified that Job Browser Pro was commonly used and professionally recognized. *See* Tr. 31 ("He relied on multiple data sources, and used both his own calculations and those produced by Job Browser Pro."). The ALJ noted that the "lower estimate from any method is what is adopted in this decision." (Tr. 31.) Harrison now argues on appeal that the Commissioner failed to meet his burden of proof because the VE's occupational estimates were not supported by substantial evidence. (ECF No. 26 at 5.)

**B. Methodology**

When a claimant challenges a job-number estimate, the ALJ must inquire whether the VE's methodology is reliable. *Ruenger*, 23 F.4th at 761 ("Administrative law judges often rely on vocational experts to estimate these job numbers. But ALJs cannot afford complete discretion to vocational experts."). "A methodology is reliable when it is based

on 'well-accepted' sources and its steps are 'cogently and thoroughly' explained." *Hohman v. Kijakazi*, 72 F.4th 248, 253 (7th Cir. 2023), citing *Biestek v. Berryhill*, 587 U.S. 97, 105, 139 S. Ct. 1148, 1155, 203 L.Ed.2d 504, 512 (2019). "[T]he expert's explanation of the methodology that he used to produce his estimate must be 'reasoned and principled' enough to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Case*, 2023 U.S. App. LEXIS 19693, at *7 (citation omitted); *see also Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020) ("Because the database of job titles is so outdated, an expert's methodology for connecting job titles to reliable estimates of the number of jobs for each title is especially important.").

The VE testified that Job Browser Pro is "typically utilized in his industry" (Tr. 53) and there is no doubt that the other sources used (DOT, OES) are well-accepted. But the court hesitates to say that the VE cogently and thoroughly explained his job-number estimates. *See, e.g., Biestek*, 587 U.S. at 105 ("[The VE] answers cogently and thoroughly all questions put to her by the ALJ and the applicant's lawyer. And nothing in the rest of the record conflicts with anything she says."). Rather, his ever-changing and conflicting testimony calls into question the reliability of the final numbers produced.

The VE originally provided job-number estimates that encompassed an entire SOC group. Harrison, however, was able to perform work within only a smaller range of jobs prescribed in the DOT. *See Fetting*, 62 F.4th at 337 (noting that "when calculating job number estimates, VEs must convert the information in the OES from the SOC system to

the DOT system"). When provided with the opportunity to correct his estimates at the second hearing, he could not do so because he had shred his notes. (Tr. 2143.) At the third hearing, he attempted to revise an estimate using the DOT title for an entirely different job. (Tr. 52.)

More problematic, though, is that the VE provided little explanation for why, despite purportedly applying the same methodology, his job-number estimates changed so drastically at each hearing. *See Chavez*, 895 F.3d at 969 ("What is entirely lacking is any testimony from the VE explaining why he had a reasonable degree of confidence in his estimates.") His purported methodology, which he frequently described as largely just his training and experience (See, e.g., Tr. 54, Tr. 715-16, Tr. 2207), led him to estimate the number of packer jobs at initially 70,000 (Tr. 2203), then only 1,333 (Tr. 716), and finally 27,000 (Tr. 53). This wild variation affords little confidence in the VE's methodology. *Compare Fetting*, 62 F.4th at 340 (noting that "the VE's testimony did not give the ALJ any reason to suspect that his methodology was unreliable") *with Ruenger*, 23 F.4th at 764 (emphasizing that "the issue in this case is not that the expert failed to provide specific numbers, but that her testimony contained inconsistencies and lacked the clarity needed for the ALJ to have confidence in her estimates").

The VE's presence at three separate hearings afforded him ample opportunity to cogently and thoroughly explain his methodology. But to support his testimony, the VE relied almost exclusively on his years of training and experience. In response to the ALJ

asking how he estimated 45,000 jobs nationally when OccuBrowse indicated there were

19,000 jobs in Illinois, the VE testified:

> "Your honor, all's I can indicate is based upon my training and experience. I realize how many numbers are listed here, and I don't agree with the number that are listed here when I take a look at some of the jobs there are. So I erode those numbers based upon my training and experience and give you the best estimate that I can based upon my training and experience. And I know that's not what you're looking for."

(Tr. 2218.) When questioned about the programs he used in combination with his training

and experience, the VE grew frustrated:

> "I'm here to answer hypotheticals. I've been doing it for 32 years, and I'm not sure when it came into play where I have to sit and discuss about SkillTRAN or Occubrowse and what it has to offer somebody."[1]

(Tr. 2211.) And when still pressed to expand on his methodology, the VE remained

evasive and combative:

> ALJ: I understand you've eroded [the job-number estimate]. The question is, how did you do it?
>
> VE: I eroded.

(Tr. 2221.) This kind of ipse dixit would never pass muster under Federal Rule of

Evidence 702. While the "measuring stick for assessing reliability" is not Rule 702, the VE

must still "offer a reasoned and principled basis for accepting the job-number estimates."

---

[1] This exchange calls to mind a remanded case where the same VE testified. *See Mommaerts v. O'Malley*, No. 23-CV-1248-SCD, 2024 U.S. Dist. LEXIS 108835, at *22 (E.D. Wis. June 20, 2024) ("When [claimant's] lawyer attempted to find out what information he input, the vocational expert claimed that he didn't understand the question and suggested that his thirty-three years of experience and curriculum vitae spoke for itself. This is exactly the type of black box treatment the Seventh Circuit has deemed problematic.")

*See Chavez*, 895 F.3d at 968-69. "'Trust me; I'm an expert' is not a basis on which to deny someone's request for disability payments." *Engel v. Kijakazi*, 635 F. Supp. 3d 661, 666 (E.D. Wis. 2022); *see also Brace*, 970 F.3d at 823. As it stands, the VE is far afield from satisfying even the lower standard of admission required in administrative settings.

Despite producing dramatically different results, the VE maintained that he applied roughly the same methods throughout. A two-page post-hearing brief explaining his methodology references some combination of education, training, and experience at least six times, but lacks mention of other substantive methods. (Tr. 715-16.) And given the chance to expand on his methodology in the final, June 2024 hearing, the VE again emphasizes the same:

> Attorney: So today for your testimony is that you're now adopting the data that you just recited from Job Browser Pro as your opinion with regards to the number of jobs specific to the DOT titles we just went through, is that correct?
>
> VE: Yeah. I utilize the SkillTRAN OccuBrowse Pro, as well as my education, training and professional experience because that's key in understanding what is required in jobs and in types of jobs that actually exist in the national economy.

(Tr. 54.) Under further questioning from the ALJ about his methodology, the VE testified he was "not abandoning my opinion as I outlined in my November 14th, 2023 letter" (Tr. 55-56)—a reference to the aforementioned post-hearing brief that emphasizes his years of experience but lacks explanation of any other methodology. (Tr. 715-16.)

The Commissioner does not dispute that the VE's estimates were "based on his education, training, and data derived from the SkillTRAN and OccuBrowse Pro databases." (ECF No. 21 at 4.) But relying on training and experience alone is not enough to ensure a reliable methodology. *See Hohman*, 72 F.4th at 254 ("Notice what we are not saying. We are not saying that a VE's testimony passes the substantial-evidence threshold based on a VE's credentials or expertise alone."); *see also Christopher G. v. Bisignano*, No. 23 C 2197, 2025 LX 245769, at *29 (N.D. Ill. July 28, 2025) ("The ALJ also pointed to the vocational expert's professional knowledge and experience in job placement but knowledge and experience alone are not sufficient to make an expert's methodology reliable, absent some explanation of how the expert applied that knowledge and experience"); *Curtis v. Kijakazi*, No. 21-cv-1426-bhl, 2022 U.S. Dist. LEXIS 223089, at *9 (E.D. Wis. Dec. 11, 2022) ("But there is a difference between slightly imperfect and impossible to follow, and a VE's method must fall closer to the former than the latter. Here, the method used is not understandable, and no amount of relevant work history can excuse that."). Even the ALJ flagged this issue at an earlier hearing. *See* Tr. 2216 ("There's a lot of different ways to do it, but how did you do it? That's the question… aside from retreating into the professional training and experience, which is a very general and inadequate way of explaining it as far as courts are concerned….").

A VE is not required to provide every detail of his calculations. *Fetting*, 62 F.4th at 339. But refusal to support testimony with data may properly tip the scales against the

VE's opinion. *Biestek*, 587 U.S. at 106-07 ("In some cases, the refusal to disclose data, considered along with other shortcomings, will prevent a court from finding that 'a reasonable mind' could accept the expert's testimony.") (citation omitted); *see also Ruenger*, 23 F.4th at 763 ("an expert's testimony will not qualify as substantial evidence when she keeps data private without good reason and her testimony lacks other markers of reliability"). This becomes especially important when testimony raises questions about the reliability of job-number estimates. *See Chavez*, 895 at 970 (explaining that VE's must offer "a reasoned and principled explanation" where "there is a world of difference between two estimates offered by a VE—800 versus 108,000 bench assembler jobs"). "This approach not only properly leaves the burden on the agency at step five, it also aligns fully with the expectations the agency itself has articulated for VEs." *Id.*, citing Soc. Sec. Admin., Vocational Expert Handbook, 8, 38 (Aug. 2017) ("You should be prepared to explain why your sources are reliable.").

It remains unclear as to how the VE used his training and experience to produce a reliable estimate. *See, e.g., Mommaerts v. O'Malley*, No. 23-CV-1248-SCD, 2024 U.S. Dist. LEXIS 108835, at *24-25 (E.D. Wis. June 20, 2024) ("Because the vocational expert's testimony about his experience did not support the examples he provided, that experience cannot serve as the foundation for relying exclusively on the SkillTRAN estimates."). And where "the expert failed to set forth an understandable methodology, we cannot review [his] methodology, let alone confirm that it was reliable." *Ruenger*, 23

F.4th at 763; *see also Christopher G.*, 2025 LX 245769, at *23 ("Ultimately, the record does not contain enough information for the Court to understand what method the expert applied to calculate his 380,000 jobs estimate for the housekeeper cleaner position."); *Curtis*, 2022 U.S. Dist. LEXIS 223089, at *9, citing *Ruenger* at 763-65 ("This confusing effort at explanation makes meaningful review nearly impossible. Like the Court in *Ruenger*, despite multiple passes at the transcript, this Court cannot discern the VE's methodology. Without this fundamental information, the [VE's] testimony could not have provided the ALJ with sufficient confidence that her methodology was reliable.") (quotations omitted); *Christopher O. v. Kijakazi*, No. 3:21-cv-50181, 2022 U.S. Dist. LEXIS 136050, at *12-13 (N.D. Ill. Aug. 1, 2022) (remanding where "VE's testimony remained insufficient for the ALJ to determine whether his methodology for estimating job numbers according to the DOT was sufficiently reliable").

### C. Forfeited Objections

The Commissioner contends that Harrison forfeited her argument by not objecting to the VE's testimony. (ECF No. 21 at 5-6.) A claimant who does not object to a VE's testimony during the administrative hearing forfeits those objections. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016). "This objection must be specific; to avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology." *Fetting*, 62 F.4th at 338. "What matters is whether cross-examination provokes 'statements that … call[] into question the reliability of the VE's bottom-line

conclusions.'" *Engel*, 635 F. Supp. 3d at 665, citing *Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008).

Harrison's counsel engaged in cross-examination that questioned the reliability of the VE's conclusions. The ALJ cut counsel's cross-examination short and a subsequent hearing had to be scheduled in order "to obtain additional evidence from the [VE]." (Tr. 30.) As the ALJ indicated in the June 2024 hearing, Harrison's counsel had previously "set forth arguments that I thought had some force, the essential being that the methodology that [the VE] previously described was based in large part upon group numbers from SOC codes…" (Tr. 45-46.) The ALJ decision refers to how "the claimant's representative objected to these job numbers on the ground that the vocational expert's methodology… is not reliable" (Tr. 29). The record additionally includes several pre- and post-hearing filings by Harrison's counsel at the time. Consequently, Harrison did not forfeit her argument at this stage.

## 5. Conclusion

The VE did not provide a reasoned and principled basis for the ALJ to accept the job-number estimates. *See, e.g., Chavez*, 895 F.3d at 970 ("The transcript leaves us with the conviction that the VE mechanically relied on outdated sources to estimate job numbers, without bringing any aspect of his extensive experience to bear on the reality of those numbers."). Accordingly, remand is necessary to determine Harrison's entitlement to benefits. *See, e.g., Westendorf v. Saul*, No. 19-cv-1019-jdp, 2020 U.S.

Dist. LEXIS 136131, at \*11-12 (W.D. Wis. July 31, 2020) (explaining that district courts "have remanded in cases where VEs provided conclusory explanations of their processes and the ALJ failed to substantively address objections to Job Browser Pro's reliability.").

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **vacated**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Green Bay, Wisconsin this 19th day of March, 2026.

*s/ Byron B. Conway*
BYRON B. CONWAY
United States District Judge